Next case is United States v. Wilson, No. 247093. Counsel, when you're ready, you may proceed. Good morning. May it please the court. My name is Jonathan Rapucci. I'm appearing on behalf of the defendant appellant Mason Wilson in this case. It is my hope and intention to reserve maybe two or three minutes for rubato. But obviously, the flow will dictate that, I suppose. The government built this child abuse and neglect case largely on inadmissible expert opinion testimony from a medical expert and law enforcement witnesses, although not endorsed as experts, nevertheless testified as such, and essentially opined that Mr. Wilson met the profile of a child abuser and was not telling the truth. This testimony invaded the province of the jury and usurped the jury's function. So when you make an objection, so the objection, Your Honor, this is invading the province of the jury, what all types of objections does that encompass? Well, I think I think it encompasses kind of the cluster of 702 and 704 objections. I think 702 and 704, I think, are the clearest, clearest ones. And 702, of course, you know, to be relevant under 702 evidence has to not do that. And so I think clearly that's kind of an invocation of rule 702. Admittedly, that objection, there weren't a lot of objections in this case, and that one is somewhat leave something to be desired, especially for us. No, I mean, I mean, that's why I ask, because it's sort of it's sort of hard to determine what the district court should be on notice of when the objection sort of vague. I agree. I agree with Your Honor. I believe that it is sufficient to trigger the 702 objection, which I think then, you know, does kind of shift the ball over to the court a little bit to have to, you know, exercise some sort of gatekeeping function when it comes to expert testimony. You know, getting back to the script just a bit, you know, these errors did affect Mr. Wilson's substantial rights, because although this case certainly the injuries to the child are indisputable and indisputably tragic case, the case was not one of overwhelming evidence. By the way, on the expert testimony, we're not reviewing for plain error, are we? Or are we? Because you said substantial rights, and that kind of triggered the question. Well, I think it gets back a little bit potentially to Judge Carson's observation, which is it's not. What's your position? What's our standard of review on the expert testimony? With regard to my position with regard to Dr. Beeson's testimony is that two of the three claims I've raised were preserved by the objections of invading the province of the jury. The third claim that I've raised, which is the fact that the expert's testimony was essentially vouching or anti-defendant vouching, I guess, basically when she described that things were consistent with certain injuries that that actually crossed the line into vouching. That was not preserved. Thank you. And, you know, I guess to take it even further, because I kind of knew that this would be coming. I think, frankly, the only other objection that really was preserved was later with regard to the law enforcement witnesses. You know, there was one to Agent Springer. There was an objection that was sustained, but then the testimony continued without any further objections with that. And that objection was that it was getting into expert testimony. That same objection was raised with regard to Detective Poffel's testimony as getting into expert testimony. Those are the only objections that were made. So, you know, everything else in the brief then does has to be reviewed for plain error, and I acknowledge that. But, you know, because, of course, it's my position that those objections were preserved with regard to Dr. Beeson's parental expectations testimony and her medical diagnosis testimony. That's where I kind of wanted to begin the discussion. The parental expectations testimony, Dr. Beeson testified that because a two-month-old baby with bruising seen on B.W.'s cheek clearly, you know, would need medical attention. And that a parent would know that, would know what she would expect the parent to bring that child to the doctor. What if the question had not been, would you expect the parent to bring that child to the doctor, but it instead have been, Dr. Beeson, what would you expect a child with these injuries to act like at home? Oh, I would expect the child to be crying a lot and exhibiting signs of pain. And you say, and the next question would be, well, would you expect the level of discomfort and crying to be different than a baby who may be crying because it's tired or because it's hungry? And the doctor says, yes, it would be a different kind of, it would be a much more noticeable sign of distress and crying and this and that. Would that be appropriate? I think that would be appropriate, Your Honor. And I think, frankly, there was testimony to that effect in this case. Right. I mean, I guess my, I'm just wondering what, if there's a big difference between her wrapping that up and saying, I would expect a parent to bring that child into the doctor. Then if she just said you would, people would notice that there's a big difference between a baby with gas or a baby that's hungry and what this baby would have been exhibiting. Well, I think the significant distinction, Your Honor, is that when you're focusing on what you would expect the parent to do, the focus has now shifted away from kind of a medical situation with a child and what the child would be exhibiting, which, of course, this doctor was extremely qualified as a pediatric specialist. But it shifts the focus on to the defendant. And I think that's where the problem comes here, is that the, by testifying to what she expects a parent to do, the natural inference, you know, it basically created a syllogism for the government, right? And that government was, well, a reasonable parent, you know, a parent confronted with these injuries would know she needed medical attention. Mr. Wilson did not seek medical attention. Therefore, his failure to do so was willful. And so that's where... But she didn't say that. She did not say that that was willful, right? Right. And that kind of leads to the 704 question, the Mary Boa question. And I do acknowledge, I was reading carefully, trying to read carefully yesterday, some of the cases, Mary Boa, Goodman, Diaz, that sort of thing. And this case is a little bit different in that it doesn't, she doesn't use the magic language. But I think it really is the functional equivalent of that. Can I ask you a question about the abuse and neglect diagnoses by Dr. Beeson? Was there any evidence in the record other than her saying so that those are actual medical diagnoses? I mean, could I look on WebMD and see that that's a medical diagnosis? I suspect that's a yes. I suspect that it is a medical diagnosis. But there wasn't any other evidence in the record other than that she, you know, certainly I think it is a medical diagnosis. And I think that naturally probably leads the court to say, well, doesn't that happen all the time, right? Isn't that exactly what an expert should do? The problem with this case is that the medical diagnoses that she testified to were child abuse, child abuse confirmed, child neglect. And these are exactly the charges that Mr. Wilson was facing. And so the potential for confusion and really unfair prejudice, I mean, that was a, it's not, it doesn't take a great leap for the jury to say, well, the doctor told us that this was child abuse and the doctor told us that this was child neglect and therefore not much for us to do here. And in fact, in closing argument, the prosecution actually made exactly that point, which really kind of crystallized the prejudice of it. And she said, you know, sorry, let me see if I can find it exactly. I wanted to get it just right. But, well, yes, no, sorry. Well, it was, it was emphasized in closing. We can look that up. Yes. What was the cross-examination on that? Did someone ask the doctor, Dr. Beeson, you don't know that Mr. Wilson did this, do you? I mean, did they confirm, she doesn't, she didn't know that he did it. Did they confirm that on cross-examination? I don't recall that being a subject of cross-examination. And, frankly, my recollection is that the defense lawyer did not, probably for good reason, want to engage this highly qualified expert very much on her diagnosis. So I think that it did not get exposed on cross-examination.  But, oh, I did find it. Okay, good. In closing argument, the prosecution said, if it really was an accident, then why does Dr. Beeson, a board-certified child abuse pediatrician, still diagnose child abuse and not an accident? And so, clearly, this testimony was playing a powerful role in the prosecution's case, and it was objected to. And so I think that's a primary issue in this case. I see I'm running out of time very quickly, so I think I will go ahead and reserve it. See what my adversary has to say. Thank you. Thank you, counsel. May it please the Court. My name is Linda Epperle. I represent the United States in this matter. Your Honors, this case involves, by its very nature, testimony that has to be given not directly from the victim because of the victim's age, but from the people who interacted with this family. We had a two-month-old victim who could not even roll over on its own at that point, end up with 10 fractures, eye injuries, ear injuries, bruises, scratches, after only three days in the defendant's care. The main questions on appeal is the question of expert testimony and the question of whether or not there was plain error in closing. There is no question but that the defendant gave varying stories at varying times in this case. He first said that the injuries were caused by a headbutt when the infant reared back its head and collided with his collarbone. He second said that the infant rolled off the bed. His third version, as the medical results continued to come in, was that the baby had rolled off of him as he was lying on the bed, and then he accidentally stepped on the child. The importance of the expert testimony here at bottom is whether or not there is a medical diagnosis of child abuse and child neglect. Responding to Judge Carson, there may well have been testimony in that pretrial hearing that dealt with those fields, but I cannot tell you if there was. But I don't think we'd be limited to just what was here at trial because there was a lengthy pretrial hearing about qualifications, and no one seemed to question but that she was qualified. But her testimony was important in explaining not only this expectation of what a parent should do, a generic parent, which would be inherent in a diagnosis of child neglect because child neglect is based on expectations we have about what a parent should do. They should feed a child. They should clothe the child. They should make sure the child has medical care. And the way that we find neglect is when a parent does not follow through with those things. We would expect a reasonable parent to do these items as here, and when they do not, that may reach the level of child neglect, particularly with injuries like this. The testimony was also important in explaining why the stories offered by the defendant were impossible, implausible, nonsensical. The child could not, because of the child's age, generate enough force to rear back into the defendant's head and cause the sort of bruises that were seen on the cheek, and for various reasons that are detailed in the record. And we go into each of these injuries, like I think it's page 15 to 18 of our brief, one by one as to what the expert said about why the explanation would not make sense. The child could not have been injured by rolling off a bed or rolling off anything because at the age of two months the child cannot roll over on its own. But the overwhelming finding on all of this plethora of injuries was that they were injuries to different planes of the body. One simple explanation or one accidental event was not going to explain them, and that's just black and white. I mean, they can see it in the x-rays that you don't fall and end up hurting various parts of your body when they're on different planes. We did not spend a lot of time in our brief on the lay witnesses and when they may or may not have strayed into expert testimony. In all honesty, this was a complicated case to make sure we got all the facts laid before the court. But I think the way that we chose to make that argument was that even if there was a stray venture into what could arguably be expert testimony, it was not plain error. Even if it was properly preserved, we could prove beyond a reasonable doubt there was harmless error given the facts of this case where we have this baby with known injuries and only two caretakers. The mother who cared for the child with no problem for two months and then the defendant who had only taken over care in the last three days. Secondly, we believe that there was no plain error in closing. Obviously, much of the closing here was dramatic. The facts were dramatic. Much of the closing probably seemed prejudicial, but here the facts are prejudicial. The important things this court considers in closing argument is is the argument when viewed in context a response to arguments made by defense counsel? Here, that was true. In defense counsel's closing argument, they argued at various times that it may have been accidental, that we hadn't proved willfulness or malice. At one point, they denied that the defendant injured the child at all. At another point, he said, well, the mother was with the child day and night, which up until three days before was true. But we needed to respond to all of those things. We did not engage in the kind of behavior that this court has outlawed, or has frowned upon, like calling the defendant a liar or something like that. Isn't it sort of like calling him a liar? Saying he told a stupid story and that his explanations were BS? It was going a ways, a ways further than probably we normally see in federal court, but this is not the type of case we typically see. This court has granted defendants a wide latitude in closing argument, so long as they are not making personal attacks, so long as they are not drawing unreasonable inferences, engaging in openly prejudicial behavior. None of that happened here. And there are cases in our brief that give details of cases where this court has approved similar comments. Here, there was calling it a stupid story. At some point, you've got to look at those varying explanations the defendant gave, and you've got to argue that they do not make logical sense. Well, saying it's a stupid story is the functional equivalent of that. There was, the final comment I'd like to make is that there was a claim that our prosecutor went to the point of civic duty and asking the jury to respond to its civic duty. We'd like to point out for the record that we were not the first people who mentioned civic duty. That was also a response to a defendant argument, and in fact our prosecutor indicated that the jury should not base its decision on emotion, but on what the defendant did here. I assume the jury was advised that statements by the attorneys is not evidence. Argument is not evidence? Yeah. Yes, Your Honor. There was an instruction to that effect given, and we overall would argue that that would cure any potential error. Would you, this is sort of broad, so I apologize in advance, but would you like to say anything about Springer and Pofl's testimony about how, I mean didn't, that seemed a lot like testimony designed to suggest that he was a liar? To some extent, but that is part of what both of those witnesses are trained to do. They investigate child abuse. Part of investigating is gathering stories from the various witnesses, determining what does and doesn't make sense, so that they know whether they need to go further down this road, whether there was a reasonable explanation. One of the things that factors in all that analysis is whether a story makes sense. That would be our comment.  Well, could I follow up on that? Sure. On Springer and Pofl. So, Agent Springer at one point said, it's common for perpetrators of child abuse to provide accidental causes of injuries, and Officer Pofl testified, it's common to minimize a child's injuries. That seems like that isn't really lay testimony, or if it is, it's lay testimony expressing an opinion, or it's expert testimony, and they may have the experiential expertise to say that, but what I'm interested in your telling us is how we should analyze that testimony here, because it seems like there was no Rule 702 determination that was made that they were qualified to testify as experts. So, what do we do with that? I don't have a good suggestion, Your Honor, unfortunately. To me, it's similar to any investigator who testifies. They're going to lay out the steps in their investigative process, and I believe that's what they were doing here, although I can see that this is one of the instances that we referenced in our brief that may come close to that line. Well, one reason I'm asking this is I think, speaking for myself, I've seen this issue come up more often in recent years, where the issue is raised as to whether the investigator, in the course of testifying, is wearing the fact witness hat or the expert hat, and this seems more like the expert hat. And so, I mean, I appreciate your candor in trying to answer the question, but I'm just looking for help on how to approach it. I'm sorry, Your Honor, I didn't mean to speak over you. I totally understand. I mean, part of when they, particularly the cases that I've seen with child abuse experts, part of the beginning of that testimony is laying out what training they've had so that their testimony makes sense, so that the jury understands they're somebody who has some skill and a process in running these investigations. And the issue has come up. The other context that I recall seeing this in recent years would have been in drug cases where a DEA agent was going to testify not only about what happened on the side of the road, but the analysis of how pure the drug was or something to that nature. And I think this Court has drawn some lines there that have been workable as far as calling some agents as pure fact witnesses, other agents perhaps to give the expert testimony. That would be difficult to do, I think, in these cases. I'm just thinking from personal experience. The child protection, it's so overwhelming. I may be going off a little bit on a tangent here, but it does seem to me that when the prosecutor calls the detective, the prosecutor could make it clear to the Court that this witness is being called to talk about the investigation based on personal knowledge. But I am going to ask some questions about the draw on this person's experiential expertise, and I'm going to lay the foundation for that testimony. It seems to me that making that record would help. Maybe I'm making a plea for help for when we get the case on appeal, but it seems to me rather than just let things go, it might be useful to have that on the record. My other fear, if that is the road the Court pursues, my other fear is that then we may have objections that witnesses who are there giving facts are in fact giving expert testimony that invades the province of the jury or that somehow crosses that line. I can see that being a thicket.  I'm getting a little off topic here, but I will get back on topic with one more question for you. I'm also curious as to what your position is on Mr. Wilson's challenge to Ms. Henson's trial testimony. I didn't see that in the brief. That's the one where she's talking about asking Mr. Wilson not to lie when they got back from the hospital. If that doesn't ring a bell, we can... No, she's alleging that he asked her to take some responsibility for what happened. Is that...  It seems to me that that would be perfectly admissible. They're arguing that it's a Rule 608 evidence rule violation. I don't see it, Your Honor. I don't. To me, that was a perfectly reasonable question and certainly explanation as to potential consciousness of guilt of the defendant that he's asking someone else to lie so he is not in as much trouble. If there are no further questions, we would ask the court to affirm. Thank you, counsel. Mr. Rappucci, your rebuttal. Thank you, Your Honor. You know, some of Ms. Epperle's comments to the court kind of helped crystallize for me what I'm trying to say. I mean, she was arguing that, you know, this is about what we expect reasonable parents to do and that the facts, you know, the facts here, the closing was dramatic, but the facts were prejudicial, you know. The overarching point of this case, and I guess it ultimately kind of funnels it into the cumulative error piece, is that at every step, the government was putting its finger on the scale in terms of making, you know, Mr. Wilson out to be a liar and the common theme here is that this was a case, as Ms. Epperle points out, there was certainly a lot of circumstantial evidence that Mr. Wilson was responsible for these injuries, right? The jury didn't need to have impeccably credentialed medical experts and Officer Detective Poffel, an incredibly credentialed expert who wasn't qualified as an expert, but clearly testified as an expert. And so at every stage, the government was adding weight onto an already prejudicial, and the government certainly has a right to try its case, I understand that, but the common theme here is that at every turn, they're just piling on vouching and piling on that Mr. Wilson's stories are incredible. Well, the jury got to hear his stories. It would have been more than enough to say, look, these stories are inconsistent. The jury doesn't need these very qualified experts to say, yeah, you know, with Poffel, I know a lie when I see one, I'm especially trained, I'm certified in the read technique, and I'm looking for indicators. It's just, it's very cohesive. They all kind of come together to kind of have a tidal wave of extra weight on the scale in a case that the jury was perfectly capable of sorting this out on its own. And I think it's important to recognize that it does, it's easy to say, well, wait a second, this was overwhelming evidence, right? But the jury pushed back on that because this was a two-day trial, and I see I'm out of time, but if I could just finish my thought. You know, this was a two-day trial. The jury deliberated for two hours, then sent out questions tending to suggest that it wasn't fully convinced that it was Mr. Wilson and that, frankly, Ms. Henson had a role in this, and then went back and deliberated for two more hours. So four hours in a two-week case, that's quick. Four hours in a two-day case, that's lengthy deliberations. And so there were issues here, the mens rea issue, and whether, in fact, it was Mr. Wilson who caused these injuries. So it's not quite right to say this is a case of overwhelming evidence and nothing to see here. Thank you, counsel. Thank you. The case will be submitted, and counsel are excused. Thank you for your arguments.